CV 13 - 1224                          Page 2

# MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | Eastern District of New York |
|---|---|---|

| | |
|---|---|
| Name (under which you were convicted):<br>Robert Simels | Docket or Case No.:<br>08-CR-640 |
| Place of Confinement:<br>FCI Allenwood Low, P.O. Box 1000, White Deer, PA 17887 | Prisoner No.:<br>76780-053 |

| | |
|---|---|
| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) |
| v. | Robert Simels |

## MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   United States District Court, Eastern District of New York (Brooklyn, NY) GLEESON, J.

   (b) Criminal docket or case number (if you know):  08-CR-640

2. (a) Date of the judgment of conviction (if you know):  12/8/2009

   (b) Date of sentencing:  12/4/2009

3. Length of sentence:  14 years

4. Nature of crime (all counts):

   18 USC 1512; 18 USC 201

5. (a) What was your plea? (Check one)

   (1)  Not guilty ☑          (2)  Guilty ☐          (3)  Nolo contendere (no contest) ☐

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6. If you went to trial, what kind of trial did you have? (Check one)          Jury ☑          Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes ☑   No ☐

8. Did you appeal from the judgment of conviction?   Yes ☑   No ☐

9. If you did appeal, answer the following:

   (a) Name of court:  U.S. Court of Appeals, Second Circuit

   (b) Docket or case number (if you know):  09-5117

   (c) Result:  Affirmed in part; vacated and remanded in part

   (d) Date of result (if you know):  8/12/2011

   (e) Citation to the case (if you know):  654 F.3d 161

   (f) Grounds raised:

   Impermissible impeachment use of illegal wiretap
   Impermissible admission of lay opinions of defendant's statements
   Erroneous admission of prejudicial evidence of a client's guilt of other crimes
   Erroneous admission of prejudicial evidence consisting of defendant's mug shot
   Erroneous exclusion of defense evidence showing state of mind as to litigation language
   Prejudicial judicial comments and diminishing defense
   Violation of third party's 6th Amendment right against interference with counsel
   Cumulative trial error and sentencing error in guideline application and unreasonable punishment

   (g) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☑  No ☐

      If "Yes," answer the following:

      (1) Docket or case number (if you know):  11-947

      (2) Result:

      Certiorari application denied

      (3) Date of result (if you know):  3/5/2012

      (4) Citation to the case (if you know):  132 S.Ct. 1725

      (5) Grounds raised:

         Whether the judge-made impeachment exception to the judge-made Fourth Amendment
         exclusionary rule may be read into Title III's unequivocal statutory suppression remedy.

10. Other than the direct appeals listed above, have you previously filed any other motions,
    petitions, or applications concerning this judgment of conviction in any court?
       Yes ☑  No ☐

11. If your answer to Question 10 was "Yes," give the following information:

    (a) (1) Name of court:   U.S. District Court, Eastern District of New York

        (2) Docket or case number (if you know):  08-CR-640

        (3) Date of filing (if you know):  8/22/2012

(4) Nature of the proceeding:   Motion for New Trial under Fed. R. Crim. P. 33

(5) Grounds raised:

    Brady violation and related suppression of evidence and access to evidence

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑   No ☑

(7) Result:  Pending

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

    (6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❑   No ❑

    (7) Result:

    (8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

    (1) First petition:      Yes ❑   No ☑

    (2) Second petition:    Yes ❑   No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

The matter is pending in the district court

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE:**

Brady violation and suppression of evidence and access to evidence

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See grounds set forth in Motion for New Trial, Docket Entries 245 and 246, and related motion for disclosure, Docket Entry 247, all of which are adopted herein by reference. The government delayed and prevented disclosure of material evidence pertaining to its central witness, Selwy Vaughn, and improperly precluded the defense from having access to the material -- including 79 recordings of undercover activity of Vaughn showing his actions and knowledge, and his transmission of information obtained as a result of entering into the Shaheed Khan defense camp. The government relied on unwarranted accusations to suppress the usability of the recordings by the defendant, including unsupported accusations of feared obstructive conduct while under indictment. The grounds for relief are more fully set forth in the prior filings DE:245-247.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

Issue was not preserved or ripe for appeal, as it requires additional evidentiary development; alternatively, ineffective assistance of counsel explains failure to preserve and raise issue.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☑   No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:  Motion for New Trial

Name and location of the court where the motion or petition was filed:

U.S. District Court, E.D.N.Y.

Docket or case number (if you know):  08-CR-640

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐   No ☑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐   No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

The matter is pending.


**GROUND TWO:**

Ineffective assistance of trial counsel

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

The multiple grounds of ineffective assistance of counsel are set forth in the addendum attached hereto.

**(b) Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:

    Issue requires evidentiary development or was otherwise not ripe or appropriate for direct appeal.

**(c) Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑   No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

## GROUND THREE:

Due process violation vitiating the convictions

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

The convictions are founded on a sting operation played out in conversations between an undercover informant for the government and a defense counsel.  The informant proceeded initially on a pretense of being a willing witness and helper for the client; his introduction into the defense camp violated due process where he was an active participant, providing false information to the defense; creating false understandings about the evidence; facilitating diversion or delay of the defense from leads and actions it was pursuing, rather than merely declining to assist; initiating discussion of bribery or subsidies for witnesses; failing to maintain protected from third party disclosure information gained by interference with the defense; initiating discussion of intimidation of witnesses; and causing the defense to take actions not contemplated prior to the witness's introduction. By using active measures to manipulate the defense, rather than passive reception of communications, the government violated due process, presenting issues for resolution by the court and jury.  The remedy is dismissal of the charges, rather than merely suppression of the evidence, where the government had no prior evidence that defendant sought to bribe or illegally intimidate a witness.  The government justified the intrusion on a false notion of jail visitation policies. [See addendum for further explanation of claim.]

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

The issue was not properly preserved.  Counsel raised a related issue, but failed to seek dismissal on due process grounds.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ❑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ❑    No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❑    No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑    No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?
If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

Other than claim one, that is pending, the remaining grounds have not previously been raised to the need for evidentiary development, the unavailability of review of ineffective assistance claims on direct appeal, or due to ineffective assistance of counsel excusing any procedural default, rather than a deliberate bypass of the claims.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?     Yes ☑  No ☐
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

Pending in this Court is movant's New Trial Motion under Fed. R. Crim. P. 33, raising issues referred to in claim one.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing:

(b) At arraignment and plea:
Gerald Shargel, 1790 Broadway, Suite 1501, New York, N.Y. 10019
(c) At trial:
Gerald Shargel and Evan Lipton,1790 Broadway, Suite 1501, New York, N.Y. 10019
(d) At sentencing:
Gerald Shargel and Evan Lipton,1790 Broadway, Suite 1501, New York, N.Y. 10019

(e) On appeal:

Barry Bohrer, Elkan Abramowitz, James Stovall, 565 Fifth Ave., NewYork, N.Y. 10017

(f) In any post-conviction proceeding:


(g) On appeal from any ruling against you in a post-conviction proceeding:



16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?     Yes ☑ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     Yes ☐ No ☑

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:


(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐  No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

   A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of —

      (1) the date on which the judgment of conviction became final;

      (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

      (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

      (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief: __grant this motion__ _____

_____

_____

or any other relief to which movant may be entitled.


_____

Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this

Motion Under 28 U.S.C. § 2255 was placed in the prison mailing system on _____

_____ (month, date, year).


Feb. 12, 2013

Executed (signed) on _____ (date).

_____

Signature of Movant


If the person signing is not movant, state relationship to movant and explain why movant is not signing this

motion. _____

_____

_____


* Note:  This document was prepared with the assistance of an attorney, but is being filed pro se
by the movant pending admission of his counsel to practice in this Court.

## ADDENDUM TO 28 U.S.C. § 2255 CLAIMS

### Factual Background

This case stems from petitioner Simels's conviction and 168-month sentence for the offenses of conspiracy to tamper with witnesses, attempted witness tampering, bribery of a potential witness, and importation and possession of eavesdropping equipment. The underlying facts involve the initiation of a federal investigation of Simels after a prison employee indicated that Simels – who had no prior criminal history and was a decades' long, reputable member of the New York criminal defense bar – visited an inmate after purportedly misrepresenting that the inmate was his client. Notably, even assuming the correctional employee's version was accurate – despite the fact it was not documented by any writing nor corroborated by anyone other than the employee, whose physical description of the attorney did not comport with Simels – the law does not proscribe a lawyer's interview of an individual, including a prisoner, who is represented by someone else; further, it was undisputed that the visit with the inmate consisted of no more than an introductory greeting, and terminated immediately upon the inmate's indication he did not wish to be interviewed. The ensuing investigation prompted by this purported occurrence consisted of the government's use of a confidential DEA informant, Selwyn Vaughn (a/k/a Fineman), a former associate of Simels' then-client, alleged Guyanese Phantom Gang boss Shaheed (a/k/a Roger) Khan, as to whom Simels was in the process of conducting extensive pretrial and trial preparation necessitating investigation and interview of witnesses in the United States and Guyana. At the government's instruction, Vaughn contacted Simels and – in conversations that were recorded surreptitiously and later suppressed as improperly obtained, although subsequently permitted to be used at trial for impeachment purposes – proposed interactions with potential government witnesses that the government contended resulted in Simels' involvement in a plan and related efforts to commit witness tampering and bribery. The

jury, which sent 32 notes seeking clarification or specific evidence during its week-long deliberations, acquitted Simels of the false statement charge, which had prompted the investigation of Simels with the primary aid of Vaughn, who was implicated in multiple violent crimes in Guyana prior to his enlistment as a confidential informant against Simels.

**GROUND ONE** – SUPPRESSING DISCLOSURE OF MATERIAL EVIDENCE.  See Docket Entries 245, 246, and 247.

**GROUND TWO – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

A.    INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO SEEK ADDITIONAL FACT WITNESSES TO CORROBORATE DEFENSE CASE, INCLUDING THE KEY ISSUE OF DEFENDANT SIMELS' CREDIBILITY, AND TO PRESENT SUPPORTING DOCUMENTARY EVIDENCE.

Defense counsel Shargel failed to call witnesses to attest to facts bearing out the good-faith nature of Simels' investigation and trial preparation in the Khan case, thus corroborating the defense. These included the following:

● **Diarmuid White** (Simels' co-counsel in the Khan case) and **Josh Dubin** (an attorney who was Simels' jury consultant in the Khan case, subsequently admitted as co-counsel *pro hac vice*) were available to rebut the government's allegations that Simels planned to bribe potential government witnesses, including Leslyn Camacho and/or David Clarke.  Simels provided White and Dubin with information, including Simels' notes, as to everything accomplished, and planned to be accomplished, in the Khan case.  These included interviews with Alicia Jagnarain, David Clarke, and the effort to find Fineman (Vaughn), which were included at trial by government exhibits 301, 305 E-520, 819.  Simels spoke with Dubin almost daily regarding the Khan case, and he received copies of Simels' emails.  Simels immersed Dubin and White in all aspects of the Khan representation, sharing notes, emails, documentation prepared as to Lilly and Clarke stemming from a prior case,

2

and Simels' efforts to locate each individual with whom Simels was accused of tampering. Pursuant to Dubin's request, Simels moved for his admission *pro hac vice* to enable Dubin to participate in the trial and be present at sidebars; the motion was granted. Dubin knew of Simels' meetings with government witness Nigel Rodney (Sharwyn Lilly), and of the plan to surprise the government with his testimony for the defense, confirming Headley's testimony that a number of individuals were named Short Man. Dubin was also aware of Simels' efforts to undermine Clarke's testimony, including Simels' visit to Clarke.

In addition, White could have testified as to money problems the defense team in the Khan case was having, and the plans to withdraw from the case as a result. White should have been called to substantiate Simels' testimony that he planned to withdraw from the Khan case, based on lack of funding, further bolstering the defense case that there simply was no money anticipated or available to bribe potential witnesses, nor did Simels have any intent to do so.

Likewise, Dubin was present at a July 28, 2008 meeting with DEA Agent Levine, whom Simels engaged in the Khan case to demonstrate the government's mishandling of witnesses in the Khan case, and heard Levine's request for funds, including to meet with Lilly and review the transcripts of the Lilly wiretap recordings. As a result of that meeting, Dubin and Simels met the following day, July 29, 2008, with Khan at the Metropolitan Correctional Center (MCC), where they discussed the lack of funds, including for Levine's services and demonstrative evidence sought to be prepared by Dubin, without which they could provide no defense assistance to Khan. The entire purpose of the July 29 meeting with Khan, as Dubin could have attested, was to discuss fees. Dubin could have explained that the defense team, including Simels and Dubin, were prepared to withdraw from the Khan case for lack of funding.

White and Simels discussed, in meetings, telephone conversations and by email, Simels'

having located Clarke in a facility in Queens and Simels' plan to visit Clarke, as well as the results of the visit. White, had he testified, would have lent credibility to Simels since he knew of the plan and was told of the results. White and Simels spoke and emailed each other concerning notifying the government that they knew Clarke was present in the United States; Simels sent White a draft of a letter Simels was planning to send to the government; White revised the letter's language. Simels sent White drafts of nearly everything Simels sent to the government or the judge in the Khan case for his input.

White and Dubin also knew that Simels was enthusiastic about a witness he had met in Guyana during his June trip there who totally undermined testimony by potential government witness David Clarke; knew of Simels' meeting with Clarke, and knew of Simels' efforts to arrange depositions with potential defense witnesses, which minimized any thought of using Vaughn as a witness on behalf of Khan.

White could have also supported Simels with respect to his application to take depositions of witnesses in Guyana, filed in January 2008, containing a summary of potential witness testimony, which the government claimed was a script for Vaughn's untruthful proposed testimony prepared by Simels, but which White could have attested was given to him by Khan at MCC, and not by Simels. Trial tr. at 1281-82. White could have testified, specifically, that Khan gave White the January 18, 2008 memo regarding the motion seeking to depose witnesses and outlining anticipated deposition testimony, including of Vaughn. White could have testified that he had reviewed the motion with Khan at the MCC, substantiating that Vaughn's anticipated testimony was not a "script" as the government, and Vaughn, claimed at trial – thereby providing crucial testimony supporting the defense and contrary to the prosecution case. White could also have testified as to Simels' ongoing efforts to arrange the depositions throughout the summer of 2008.

4

White could also have testified that he was engaged in plea discussions with the government as to Khan, substantiating Simels' testimony that his (Simels') description to Khan on the July 19, 2008 Title III recording pertained to those discussions.  He could also have confirmed Simels' enthusiasm for Rawle Gulliver after returning from Guyana the week of June 20, 2008, to show how the defense team was approaching George Allison and other witnesses.  White could have substantiated that, in light of Gulliver's information and prospective testimony, no other witness was needed, as reflected in Simels' emails to White about Rawle.  And White could have testified that Simels called him as he was driving into his law office in New York City on September 10, 2008 to meet Camacho, whom he identified as Clarke's girlfriend.

• **Larry Frost**, an investigator engaged by Simels in the Khan case, who was present when Simels visited Clarke at the Queens facility.  Frost could have rebutted the government's allegation that Simels lied to the prison employee, enhancing Simels' credibility not only as to the false-statement accusation but as to the remainder of the charges, as well.

• Shargel was also ineffective in failing to present documentary evidence to support Simels' testimony that he had prepared a letter indicating he planned to withdraw.

• **Chuck Avakian**, an investigator in the Khan case who, *inter alia*, traveled with Simels to Guyana for investigative purposes, Trial tr. at 1389.  Avakian, as well as other investigators, including Frank Gonzalez, Trial tr. at 1230-31, could have attested to the legitimate, extensive nature of Simels' pretrial investigation on behalf of Khan, both in Guyana and the United States.  Simels in fact had employed more than 10 private investigators, made four trips to Guyana to identify and interview witnesses, successfully sought permission to depose 9 witnesses in Guyana on the basis he was seeking information concerning anticipated government witnesses Jarnagain and Clarke, and sought information about Jarnigain and Clarke through official requests to the government of

5

Guyana. Investigator testimony to substantiate the good-faith, comprehensive nature of Simels' investigation efforts would have significantly enhanced Simels' credibility. In his closing argument, Shargel himself recognized the dearth of investigator corroboration, but left the matter unexplained. *See* Trial tr. at 1261-62 (Shargel stating "We didn't call every investigator" – without offering any reason for having failed to call only one). Shargel, in fact, did not permit Simels even to meet with Avakian, despite their longstanding relationship with respect to the Khan investigation. Avakian, himself a former undercover agent for the FBI, could have testified concerning Simels' conversations and activities in Guyana, as well as that many Guyanese think and talk similarly to Vaughn, with the concept of being solicited for money not unique, and the need to gain a witness's confidence typically acquired over a number of meetings.

- **Former DEA Agent Levine**, whom Simels engaged as a DEA expert to challenge the government's handling of witnesses and the investigation in the Khan case. Levine was aware of the costs needed for his services, which included meeting with Lilly and reviewing the Lilly wiretap transcripts.

- **Peter Headley**, convicted of drug dealing and incarcerated in the United States, acknowledged to Simels that he, not Khan, was the Short Man referred to in the drug ledgers of Alicia Jagnarain. Headley, had he been subpoenaed, could have testified as to the wholly legitimate nature of his approach and interview by Simels investigator Frank Gonzalez, which resulted in Simels' obtaining valuable information countering the prosecution case with respect to Khan, given that Khan's characterization as Short Man in the indictment against him. Headley, if called as a witness, would have corroborated Simels' testimony as to this key matter and further countered the allegation that Simels sought to bribe Alicia Jagnarain, given Headley's availability to definitively counter her accusations. Trial tr. at 1216-17, 1230-31.

6

- **Sharwyn Lilly (Nigel Rodney)**, could have been called as a witness to establish that Simels did not intimidate witnesses and that it took five interviews with him – none of which involved any pressure or intimidation – in order to obtain information from him.

- **Juanita Singh**, Simels' secretary, could have bolstered Simels' testimony that the $2,500.00 in cash found in Simels' office at the time of his arrest pertained to a different client, countering the prosecution theory that this money was improperly intended as a bribe for Leslyn Camacho. Given that the cash was found in a locked drawer in a different room in Simels' office than the one where he was to meet with Vaughn and Camacho and also was not the amount referenced in Simels' prior conversations with Vaughn, Singh's testimony would have enhanced Simels' credibility markedly.

- **Susan Gaswirth**, bookkeeper for Shargel, could have testified as to the nature and attribution of the cash in Simels' office as well as the lack of funds afforded by Khan. ''

- Shargel failed to develop and present detailed evidence at trial concerning Simels' Currency Transcript Report (CTR) records and bank records showing cash deposits that could have provided corroborative evidence..

- Shargel failed to discuss the government's usage of Title III-violative recordings at trial, and never considered the possibility that the judge would permit its use as impeachment. Shargel did not prepare Simels for testimony concerning the recording that was ultimately introduced pertaining to the July 29, 2008 conversation between Simels and Khan, and failed to ask him to explain its substance in any detail on direct or redirect. Nor did Shargel call Josh Dubin, Simels' jury consultant who was present for a portion of the July 29th interview, about the conversation.

- Shargel failed to investigate and call as witnesses other defense attorneys who had cross examined Alicia Jarnigain in related cases, believed she was lying, and who would have

7

substantiated Simels' testimony as to his lawful investigation of Jarnigain, resulting in his obtaining

useful and reliable evidence challenging her credibility, supporting his testimony as to his lack of

any intent, plan or efforts to bribe her or obstruct justice with regard to her potential testimony on

behalf of the government in the Khan case.  Trial tr. at 1217-18.  Nor did Shargel call **Jacques**

**Semmelman** or **Richard Levitt**, other attorneys who worked with Simels on the Khan case and

could have corroborated Simels' bona fide legal representation in the case.  *See* Trial tr. at 1261-62;

1270.

- **John Conti**, an IT independent contractor, could have substantiated Simels' testimony

that he had asked Conti to access Khan's equipment obtained from Guyana, thereby corroborating

the legitimate nature of Simels' investigation of this equipment.

Defense counsel Shargel failed to call fact witnesses who would have explained, and

corroborated Simel's testimony concerning, his lawful meaning in using the terms "neutralize,"

"kill" and "destroy," and related terminology, with respect to opposing witnesses and in the course

of trial preparation. *See* Trial tr. at 1342.  These witnesses' testimony would likewise have countered

Vaughn's improper testimony that Simels' use of the term "neutralize" meant that he wished Vaughn

to "persuade [a witness] not to testify or to change his testimony," and "neutralize on

cross-examination" meant that Simels wanted Vaughn to "get a few persons, including myself, to

come lie on [Clarke]."  Trial tr. at 345, 399.  These include:

- **Josh Dubin**, an attorney and jury consultant engaged by Simels to assist in the Khan case.

Dubin worked closely with Simels in preparing for trial, and could have attested to their lawful and

appropriate use of the term "neutralize" in connection with the case.  Dubin, at a meeting with Khan

and Simels on July 29, 2008, himself told Khan of the need to neutralize the government in jury

selection and at trial.  Simels advised Shargel, after listening to the tape of that conversation, that

Dubin's testimony was needed to show how common it was to use the term "neutralize." The government in its closing argument ridiculed Simels' explanation of "neutralize," The impact of the government's ridicule would have been substantially minimized, if not entirely eliminated, had Shargel presented Dubin's corroborating testimony.

- **Ruth Liebesman**, a former associate in Simels' law offices, who, in a September 4, 2009 letter to the Court in support of Simels for sentencing purposes, described with specificity Simels' wholly legitimate use of those terms as a part of his trial preparation, reflecting merely zealous advocacy.

- **Diarmuid White**, whose September 19, 2009 sentencing letter to the Court in support of Simels similarly detailed the bona fide nature of Simels' trial preparation involving his mastery of all pertinent facts and details and its inconsistency with trying to influence witnesses, including as to David Clarke, as well as that Simels' style of practice and level of savvy – as personally known to White – were inconsistent with the government's interpretation.

- **Nicholas Pileggi**, whose sentencing letter on Simels' behalf elaborates the innocuous nature of the verbal terms and interactions ascribed to Simels.

**B.**   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN LIMITING SIMELS' ABILITY TO ASSIST IN PREPARING HIS DEFENSE AND IN FAILING TO PREPARE SIMELS FOR TRIAL, INCLUDING HIS OWN TESTIMONY.

Defense counsel Shargel failed to meaningfully involve the defendant, who had irreplaceable knowledge and understanding of the relevant events and their relationship to physical evidence and witnesses, in the preparation of the defense and investigation of the case, including:

- Shargel refused to let Simels speak with or be present at interviews with Diarmuid White, his co-counsel in the Khan case. On September 10, 2008, the date of Simels' scheduled interview of Leslyn Camacho and the day he was arrested, Simels called White on his cell phone while driving

9

to his law office in anticipation of the meeting with Camacho.  In their conversation, Simels advised White of his forthcoming interview with Camacho.  Shargel not only failed to seek documentation of the call, but also failed to permit Simels to participate in an interview with White, which would have prompted White's recollection of their telephone conversation that day and, in turn, would have bolstered Simels' account and credibility with respect to his bona fide trial preparation efforts, including as to Camacho.

● Shargel failed to seek permission for Simels to listen to the 81 taped recordings that were belatedly disclosed by the government, nor did Shargels himself listen to the recordings.  Had Simels listened to the tapes, he could have found evidence of an impermissible breach in the so-called "attorney wall" between Khan prosecutors and Simels prosecutors, as set forth in the U.S. Attorney's Office document of September 23, 2008.

● Shargel failed to substantiate his remark in opening statement, Trial tr. at 219, that Simels had a hearing problem that surfaced during a conversation with Vaughn, by providing evidence of Simels' hearing loss and use of hearing aids, as set forth in greater detail in a September 5, 2012 letter by defense counsel to the Probation Office for purposes of sentencing.  Such evidence would have lent credence to the defense argument that Simels' interactions with Vaughn during their conversations were marked by a bona fide hearing impairment.

● Shargel did not permit Simels to be present during an interview with his bookkeeper, Susan Gaswirth, precluding Simels' ability to assist in garnering evidence corroborating Simels' testimony as to the cash in his office and the lack of funds afforded by Khan.

C.   INEFFECTIVE ASSISTANCE IN FAILING TO CHALLENGE ERRONEOUS RULINGS AND IN WAIVING PREVIOUSLY-RAISED POSITIONS.

The Court's suppression of unlawful wiretap evidence constituted an important victory.  Yet,

10

at the very outset of trial, as a result of his opening statement stating that the defendant would testify, defense counsel vitiated the beneficial impact of the suppression by giving an opening for the prosecution to seek use of a key conversation between Simels and Khan for the purpose of impeachment. Trial tr. at 1099-1011. This recording provided the only direct evidence supporting the allegation that Simels and Khan had discussed paying a potential witness. .Defense counsel should have moved in limine to preclude use of the recorded evidence as impeachment, on the basis its use violated Title III and, further, was inaudible; had the motion been denied, the trial strategy of signaling to the jury that Simels would be testifying, and provide definitive evidence on which they could evaluate his intent, Trial tr. at 217, could have been recalibrated so as to avoid the inevitable harm to the defense arising from presentation of a previously-suppressed recorded conversation to counter, by means of "impeachment," Simels' testimony as to his intent in his interactions on behalf of Khan's defense.

The trial judge precluded Simels from answering fully during his cross-examination, including with respect to the July 29, 2008 conversation between Simels and Khan that was admitted as impeaching evidence referencing Leslyn Camacho. Yet Shargels failed to object on behalf of Simels, instead acceding to the Court's *sua sponte* intervention on behalf of the government that impaired Simels' right to testify in his own defense. The judge's remonstrations of Simels were far more harmful than they would have been had they been prompted by merely an objection by the government; that the Court time and again intervened spontaneously conveyed to the jury its belief that Simels was obstreperous and untrustworthy, a particularly damaging view in an obstruction of justice case as here. *See, e.g.*, Trial tr. at 1449-50 ("The Court: Don't volunteer. The Witness: I'm sorry, Your Honor. The Court: Mr. Shargel can conduct a redirect if he wants to, but Mr. D'Alessandro has a right to insist that you answer only the questions he poses.").

11

Shargel also was ineffective in failing to challenge testimony by Vaughn and closing argument by the government repeatedly emphasizing violent acts, including kidnapping, torture, multiple murders and attempted bombings, attributed to Khan and Phantom Gang members. Although Simels lacked awareness of, or involvement in, this conduct, a demonstrative exhibit unfairly tied Simels to this criminal group and the government repeatedly invoked violent imagery, *i.e.*, referring to Vaughn as a "loaded weapon" that Simels "aim[ed]... right at the witnesses." Trial tr. at 1891. Despite the massively prejudicial impact of the government's implied linkage of violence to Simels, Shargel failed to object to the government's ongoing thematic invocation of such violence in the presentation of its case through questioning and in closing argument.

**D.** INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN USING PROSECUTION-FAVORABLE EXPERT WITNESS, ANTHONY RICCO.

The Court introduced Ricco's testimony by advising the jury that he would not be testifying as to "historical facts but to the nature of bona fide legal representation." Shargel should have presented testimony by at least one other criminal defense attorney, including after Ricco had testified and it was clear that his assertions were significantly prosecution-oriented. Shargel, who did not advise the government of its intention to use Ricco until just six weeks prior to trial, did not afford adequate time and preparation to the crucial matter of engaging an effective defense attorney expert. Shargel was ineffective in using Ricco without adequately probing his conflict of interest and that his testimony would actually support Simels, particularly where other defense experts were available and willing to attest to the propriety of Simels' methods as a defense attorney; Shargel was also ineffective in failing to seek another defense expert after Ricco failed to champion the role of defense counsel, and in fact attested to practicing in ways at odds with Simels' theory of defense. For example:

12

- Ricco testified that he speaks to all clients in the same manner, and did not support Simels' use of language with Vaughn as ordinary. That is counter to Simels' testimony that he approaches each client differently. Shargel should have engaged a defense expert who approaches different clients differently, such as Nicholas Pileggi, whose sentencing letter on behalf of Simels indicated that agreeing with sociopaths – such as Vaughn and other prospective witnesses with whom Simels and his defense team spoke – encouraging them to continue the dialogue are "tools of the trade, not unlike the techniques used by law enforcement to elicit information."

- Ricco testified that most lawyers do not contact a cooperating witness without government awareness. Trial tr. at 1143.

- Ricco testified that he had never given someone a prepared affidavit, but it's done, "with corrections, options."

- Ricco testified that defense counsel's supervening obligation is to the Court, which he stated is higher than to the client.

- Ricco testified that he personally never engaged in many of the strategies used by Simels, offering personal anecdotes that were contrary to Simels' handling of the Khan representation. This included his assertion that he contacted law enforcement before proceeding with a reverse sting of a potential witness, which was contrary to Simels' actions, and was used by the government in its cross-examination of Simels and in its closing argument.

Ricco had stressed that when he was in a position where a witness made a comment about harming people, he reported the conduct directly to the government. This differed from Simels' conduct, painting Simels in a poor light, and resulting in the government's cross-examination of Simels as to why, if he thought Clarke was soliciting a bribe, Simels did not report it to the government.

13

The prejudice arising from Ricco's testimony is demonstrated by the fact that the Court, the government and the jury relied centrally on Ricco's testimony:

- The government relied on Ricco's testimony in its closing argument, calling it "devastating" to Simels' defense. Trial tr. at 1664 (prosecutor stated that Ricco testified that when a witness or a witness's attorney indicates they don't wish the witness to speak with you, you cannot interview them. *See also* Trial tr. at 1897 (prosecutor disputing defense bribery-sting theory as to Camacho by invoking Ricco's testimony: "Why not call law enforcement in advance, like their own expert said he did. He walked out of that jail. What did he tell you his first call was? His first call was to the U.S. Attorney's Office.").

- The Court invoked Ricco during jury instructions, and discussed the importance of Ricco following the return of the verdict: "I listened very carefully to the testimony of Anthony Ricco and learned from it. Maybe that's because I never had experience representing a criminal defendant." Trial tr. 2139. The Court's jury instruction on Simels' bona fide good-faith legal representation defense singled out Ricco's testimony. Trial tr. at 1926-27 ("You heard testimony from Mr. Ricco on the subject of representing defendants in criminal cases. In considering the conspiracy charged in Count One, and in considering all of the attempted witness tampering charges I will be turning to in a few moments, you may consider that testimony, along with all the other evidence in the case, in determining whether the government has proven beyond a reasonable doubt the elements of the particular crime charged and that the conduct of the defendant you are considering did not constitute lawful bona fide legal representation.").

- During their deliberations, the jury sent a note requesting Ricco's testimony. The Court sent them three copies of his testimony in its entirety. Trial tr. at 1970, 1974-75.

- Defense counsel insisted on using only Ricco, despite the identification prior to trial of

14

other potential experts on the language and tactics of defense attorneys, including Don Samuels, a prominent Atlanta defense attorney who offered repeatedly to testify on behalf of Simels – but whom Shargel never even called to discuss the case – as well as Lee Ginsberg, Murray Richman and David Lewis.

- Ricco's connection to the Court possibly created a conflict of interest, given that he was a member of the Criminal Justice Act (CJA) Panel for the Eastern District of New York overseen by the CJA Panel Committee, of which the trial judge was a member. Shargel was ineffective in failing to investigate and act on that potential conflict, resulting in Ricco's failure to support Simels before the trial judge or to risk the wrath of the U.S. Attorney's Office. These are issues that Shargel should have discussed with Ricco prior to engaging him as a defense expert. Moreover, because Ricco met with the government prior to his testimony, Shargel should have inquired as to what the prosecution had advised Ricco they would be asking him on cross-examination.

- Shargel, who had indicated he would call a former FBI agent to discuss tactics in questioning witnesses, decided not to do so, without advising Simels until after Ricco's testimony.

- Shargel told Simels that he had to testify in order to counter Ricco's testimony. Yet, he failed to adequately prepare Simels' examination, and, in conducting it, succumbed to pressure by the district court.

E.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN FAILING TO SEEK RECUSAL OF TRIAL JUDGE DUE TO ABUNDANT EVIDENCE OF PERSONAL ANIMUS TOWARD, OR BELIEF IN ETHICAL LAPSES OF, LEAD DEFENSE COUNSEL RESULTING IN A TRIAL EVIDENCING BIAS AND/OR FUNDAMENTAL ERROR PRECLUDING A FAIR TRIAL.

**1.   Violation of Sixth Amendment right to effective assistance of counsel in failing to seek recusal of adversely biased trial judge and in failing to challenge bias of trial judge, instead foregoing essential challenges in an improper effort to curry favor with**

15

**the judge**.  The trial judge had a record of extreme and longstanding antagonism towards

defense counsel Gerald Shargel.  This animus stemmed from the period when the judge,

former Chief of the Criminal Division of the U.S. Attorney's Office for the Eastern District

of New York, prosecuted Shargel's notorious client, John Gotti, who was accused of

wrongdoing – including bribery – as an organized crime boss of the Gambino crime family,

as well as other alleged organized crime figures whom Shargel either defended or assisted

in defense efforts.  While working as a prosecutor, the trial judge accused Shargel of

misdeeds and corruption related to his representation of Gotti and other accused organized

crime figures, and pursued grand jury and other investigative and judicial means of relief in

threatening Shargel with indictment.  The trial judge characterized Shargel as being "house

counsel" for the "mob," reflecting his view of Shargel as himself part and parcel of the

Mafia, and a conspirator of Gotti. *See Frederic Dannon, Defending the Mafia, New Yorker*,

Feb. 21, 1994, article detailing longstanding animus on part of trial judge towards Shargel;

quoting ascription of corruption to defense counsel: "The reality is that attorneys are as

integral a part of the Gambino crime family as any of its other members").  Then a

prosecutor, the trial judge successfully sought to bar Shargel from representing a Gotti

codefendant, reputed mob member Sammy Gravano, because the government was planning

to portray Shargel, based on his "house counsel" status, as a participant in the mob enterprise.

*Id.* at 65, 87.  *See also Defending the Mafia* at 74 (trial judge described as viewing Shargel

as corrupt and "sinister").  Thereafter, the trial judge engaged in an ongoing effort to bring

criminal charges against Shargel for obstruction of justice and tax fraud – charges akin to

those brought against Simels in the instant case.  In 1993, the trial judge convened a grand

jury that issued subpoenas to Shargel for his financial records.  Shargel also was aware that

16

"he could never be [the trial judge's] ideal of a criminal defense lawyer." *Id.* at 69. Indeed, when he was a federal prosecutor, the trial judge stated that "he could never be a ... colleague of these people," referring to defense counsel such as Shargel. Stating that, in earlier years, a prosecutor would perhaps overlook that Shargel had "taken a lot of money under the table, according to his client," the trial judge explained further his actions against Shargel: "I suppose there are prosecutors who would say, O.K., Jerry, fine. But I don't happen to be one of them." *Id.* at 88. The trial judge has explicitly written that Shargel assisted Gotti in obstructing justice in a criminal prosecution in 1989-90, for which Gotti was convicted. According to the trial judge, Shargel was "in fact implementing Gotti's desire to corruptly prevent [a witness's] testimony" in an obstruction of justice and perjury prosecution against Tommy Gambino, a reputed crime family member. *Defending the Mafia* at 82-83. And Shargel has indicated that the trial judge's efforts had a personal edge that was not confined to merely being on opposite sides of a particular case. *Defending the Mafia* at 77 (noting that then prosecutor [now trial judge], as opposed to another prosecutor who had successfully sought to disqualify Shargel in 1985 based on organized-crime connections and ongoing investigation of Shargel's conduct, "got personal" in his animus towards Shargel). Shargel knew that the trial judge had a different view of the role of a criminal defense counsel than Shargel; the trial judge had, in fact, prosecuted an attorney represented by Shargel based on a theme of "Just because you're a criminal lawyer, you can't be a criminal?," *id.* at 83 – precisely the theme of the prosecution against Simels. Despite the documented hostility towards Shargel stemming from a case involving accusations of bribery and corruption, including on the part of counsel for a crime boss, that were remarkably analogous to those for which defendant Simels stood accused, based on his representation

17

of another accused crime boss, Shaheed (Roger) Khan, Shargel failed to seek recusal, upon learning of the judge's assignment to the Simels prosecution; nor, in the alternative, did Shargel seek to withdraw from Simels' representation in light of the debilitating bias he knew the judge bore towards him based on their prior interactions.

Despite this longstanding antagonism, Shargel failed to seek recusal of the trial judge or, alternatively, to withdraw from the case upon learning of the assignment of the case to the very trial judge who had accused and actively investigated Shargel for wrongful conduct analogous to the impropriety of which Shargel's client, petitioner Simels, stood charged. Shargel, as a result, had an abiding conflict of interest and was effectively hamstrung in his representation of petitioner Simels, before a judge he knew to bear him ire, particularly with respect to a case like Simels' that involved allegations of bribery involving counsel for an organized crime boss. Shargel sought instead to curry favor, dampening his arguments or failing to raise arguments or pursue avenues that he perceived as being counter to his self-interest vis-a-vis the presiding judge – who had made clear his mistrust of Shargel. *See Defending the Mafia* at 70 (Shargel's sister stressing that Shargel "wants people to like him, and *will go to extraordinary lengths to repair a rift.*")(emphasis added). The result was a sharp blow to the defendant's ability to appear before a neutral and impartial tribunal, and tainted the entirety of the defense strategy both in its broad strokes and with regard to particular instances of impropriety to which Shargel demurred. The harm extended to failing to seek and call witnesses and in relying on a prosecution-favorable expert witness, who failed to champion the role of defense counsel that Shargel knew to be inimical to the presiding judge's view. Shargel's ineffectiveness was amplified in his failure to challenge the judge's repeated demeaning of Simels and challenge to Simels' credibility and ability to

18

testify in his own defense. And Shargel was ineffective in failing to seek recusal during trial, when the judge made specifically prejudicial rulings and remarks.

2.      **Additional prejudice arising from the failure to recuse in the violation of Fifth and Sixth Amendment rights to due process and to a fair and impartial trial and tribunal**. The trial judge exhibited pervasive bias against the defendant and defense counsel, and/or made rulings contrary to the defendant's fundamental Fifth and Sixth Amendment rights, as reflected in repeated comments demeaning the defendant and defense counsel, particularly during petitioner Simels' testimony, amounting to an interference in Simels' Fifth Amendment right to testify in his own behalf, and following defense closing argument, as well as in prejudicial evidentiary rulings, including in permitting the government to use suppressed wiretap evidence for the purpose of impeaching the defendant's testimony, contrary to the plain language of 18 U.S.C. § 2515; permitting the government's key witness and confidential informant Vaughn to testify as to his beliefs concerning Simels' intentions and meaning in their conversations despite their highly ambiguous language and context, where the statements were not in code and no basis was offered for Vaughn's opinions, and in further refusing to instruct the jury that it was their role, not Vaughn's, to infer Simels' intent; failing to grant a mistrial following testimony that Vaughn and his family had received death threats, including the night before his testimony, and allowing further Vaughn testimony that he would be killed if he returned to Guyana and that he had received money to transport his mother and sister to the United States because of daily threats to them; permitting inflammatory testimony by Vaughn regarding unrelated violent conduct involving torture, attempted bombings and murders by Khan and Khan associates, although Simels had nothing to do with those acts and lacked awareness of their commission, linking such activity

19

to Simels by displaying his mug shot on a poster board above head shots of the Phantom

Gang members and their murder victims, thereby suggesting he was the criminal group's

head and was involved in their violent deeds, and blurring the distinction between the crimes

allegedly committed by Simels and crimes committed by Khan; excluding a book chapter,

"Cross Until They Drop," in *Take the Witness: The Experts Speak on Cross-Examination*

(Lawrence W. Newman & Rikki Klieman eds., Juris Publishing, Inc. 2006), that corroborated

Simels' abiding thoughts and beliefs concerning criminal defense investigation and cross-

examination on behalf of a client – expressed views which pertained directly to the *mens rea*

element of the offenses charged against him, all of which arose from just such criminal-

defense efforts in the Khan case — and corroborated Simels' defense that when he talked to

Vaughn about gathering information to "neutralize" or "eliminate" witnesses, he was

referring to legitimate advocacy, not witness tampering; and failing to dismiss charges that

Simels imported and possessed devices that "can be used" for wiretapping, even though the

equipment at issue was inoperable and obsolete, tainting his convictions on the other counts

with prejudicial spillover.

The Court's bias was evident prominently during key moments of the defense case

– throughout the defendant's testimony and immediately after defense closing argument,

when there was no chance for the defendant to remedy or respond to the judge's pointedly

disparaging comments that deflated the impact of the defense closing argument and, thereby,

the validity and credibility of the defense, defendant, and defense counsel. The harm to the

defendant was intensified by the government's reliance on the Court's continual, disparaging

comments as a centerpiece of its attack on the viability of the defense during its own closing

argument. Trial tr. at 1656. The government pointed to the Court's repeated interruptions

and remonstrations of the defendant as proof of the defendant's lack of credibility. The trial judge, who was on record as believing defense counsel to be a conspirator in organized crime activity akin to the charges against petitioner Simel in the instant case, presided despite these documented views; and defense counsel failed to challenge the Court's multiple biased rulings and remarks at trial, to Simels' extreme prejudice. Additional instances of these violations, which pertain both to the instant claim and to the claim of ineffective assistance of counsel include the following:

•       During Simels' cross-examination, the Court interjected repeatedly and *sua sponte*, taking on the mantle and role of prosecutor, with no objection from Shargel. These interrupting comments and instructions unduly constricted and broke the momentum of Simels' testimony as well as of the jury's ability to evaluate fairly his testimony, and signaled to the jury the judge's disdain for Simels and skepticism as to Simels' veracity. Trial tr. at 1276; 1295, 1315, 1388, 1402, 1456, 1473, 1486, 1491-92, 1494, 1507-08; *see also* 1444-45. After a response by Simels that he did not remember hearing a statement by Vaughn, the prosecutor indicated he could play the tape again if Simels' recollection needed to be refreshed; Simels declined the offer, indicating he could hear it on the tape, but the Court intervened *sua sponte* once again, telling the prosecutor that he could play it again anyway. Trial tr. at 1473. The Court also scolded Simels during his cross-examination after sending the jury out, stating, *inter alia*, that "I'm going to start stepping on you in front of the jury." Trial tr. at 1460. These remonstrations were prompted largely by Simels' efforts simply to respond fully to the prosecutor's questions, and were voiced by the Court repeatedly despite the lack of any pending objection by the government. The

21

judge also expressed concern that Simels' testimony about the facts of the case, which involved his role as defense counsel to his client, Khan, amounted to "diatribes against the government." Trial tr. at 1375. In addition, the Court repeatedly instructed the jury that Simels' testimony as to what Khan and others told him could not be credited with being true, repeating its initial instruction to this effect over and over, such that the Court engaged in constant reminders to the jury that they had better not ascribe truthfulness to Simels' account. *See, e.g.*, Trial tr. at 1276 ("Q. Continue. The conversation with Roger Khan about the laptop. A. He said to me that when – Q. The Court: Excuse me. Bear in mind, none of this can be considered by you as proof of the truth of what Khan, according [t]o Simels, said to Simels. Understood?").

- The government used the judge's constant scolding of Simels to substantiate its argument that Simels was untruthful, and despite a sustained objection, proceeded to amplify its prejudicial comments without Court admonition or an instruction cautioning the jury to disregard the prosecution's remarks, and without an ensuing defense objection, request to strike, or motion for a mistrial:

PROSECUTOR: When I asked him questions, it took eight times, the judge instructed him eight times, answer the question. Is that somebody who is testifying truthfully? Who is trying to give the truth, the whole truth and nothing but the truth? Or someone that's being evasive, who is trying to hide the truth?

These are portions of the trial transcript. On page 1449, the judge had to instruct him, don't volunteer. I'm sorry, Your Honor. Mr. Shargel

MR. SHARGEL: I object to this. This isn't evidence.

22

THE COURT: Yes. Sustained. Focus on the testimony.

And prosecution continues, without defense objection (or Court admonition):

MR. D'ALESSANDRO: Eight times. Why? If he was there to tell the truth, the whole truth and nothing but the truth, why did he have to be instructed to answer the questions? Let's not forget. He's not just anybody. He's a lawyer. And not just a lawyer. He's a trial lawyer, with over thirty years of experience. He knows his obligations on the stand. He knows the difference between direct, cross-examine and redirect. He knows the differences between a truth and a lie. He knows how to answer a question and knows how not to answer a question. He could have told you the truth. He couldn't tell you the truth. He decided to be evasive.

Trial tr. at 1656.

- The prosecutor continued its efforts to brand Simels as a liar based on the judge's unfair interjections as well as its own improper aspersions, which Shargels failed to challenge. Trial tr. at 1642, 1666, 1721 ("I suppose we shouldn't be all that surprised about his decision to lie. He's on trial for obstructing justice on behalf of his client. What's to stop him from getting on the stand, trying to obstruct justice in his own case? He thinks the rules don't apply to him. He's wrong."; These defendants think the rules don't apply to them";"Who cares if it's illegal? They think the rules don't apply to them."); 1883 ("As reluctant as Robert Simels was to tell you, you can't bribe people to tell the truth."); 1884-85 (ridiculing defense as "preposterous," "ridiculous," "so preposterous"; effectively shifting the burden of proof: "His defense is, I wasn't going to bribe anyone. I was never going to bribe anyone. So what's the point of that? The point, ladies and gentlemen, is to take the

23

focus off the defendants and put it on the government. But here is a news flash.

Guess what? The government is not on trial here. Those two people are. They're on

trial.").

F.    INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO CHALLENGE THE OUTRAGEOUS NATURE OF THE GOVERNMENT'S CONDUCT IN INITIATING AND PURSUING THE INVESTIGATION OF SIMELS, INCLUDING FAILURE TO REQUEST AN EVIDENTIARY HEARING AND TO PROFFER FACTS SUPPORTING THE NEED FOR SUCH A HEARING.

Counsel was ineffective in failing to raise a due process or outrageous conduct argument and

failed to preserve claims for an evidentiary hearing as to the due process issues raised in Ground

Three below.

G.    INEFFECTIVE ASSISTANCE OF COUNSEL IN PREPARING SIMELS FOR HIS TRIAL TESTIMONY AND IN HIS EXAMINATION OF SIMELS AT TRIAL.

Defense counsel Shargel's purported strategy was to have Simels provide a narrative of his

defense efforts on behalf of Khan in response to a number of open-ended questions. The trial judge,

however, admonished defense counsel to "structure" Simels' responses, granting a government

motion to strike a comprehensive answer. Trial tr. at 1244. Thereafter, defense counsel began to

skip areas of inquiry, succumbing to the pressure exerted by the trial judge. Defense counsel also

apologized to the Court for the length of his examination of Simels. Following Simels' cross-

examination, when the judge time after time precluded Simels from giving complete responses,

defense counsel – contrary to his assurance to Simels that he would ask Simels to explain those areas

that he had been foreclosed from addressing fully during cross-examination as well as to explain

Simels' July 29, 2008 conversation with Khan – failed to do so. Shargel did not prepare Simels for

testimony concerning the recording that was ultimately introduced pertaining to the July 29, 2008

conversation between Simels and Khan, and failed to ask him to explain its substance in any detail

24

on direct or redirect.  Nor did Shargel call Josh Dubin, Simels' jury consultant who was present for

a portion of the July 29 interview, about the conversation.

H.     FUNDAMENTAL ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL IN
       PERMITTING KEY GOVERNMENT WITNESS VAUGHN TO GIVE HIS OPINION OF
       SIMELS' MEANING IN THEIR CONVERSATIONS, I.E., THAT SIMELS MEANT TO
       BE OFFERING A BRIBE TO POTENTIAL WITNESS, LESLYN CAMACHO, AND
       OTHERS, DESPITE THE AMBIGUOUS NATURE OF THE ACTUAL WORDS USED.

       The Court permitted Vaughn to testify that he believed Simels intended to bribe potential

witnesses.  The Court rejected a defense objection on grounds of relevancy and an alternative request

to exclude such testimony under Fed. R. Evid. 403 as unduly prejudicial; the Court also rejected an

alternative defense request for a jury instruction.  Defense counsel was unprepared, however, to

substantiate its objection.  While indicating there was supporting case law, defense counsel

acknowledged that he did not know what it was and did not ask for leave to obtain and present such

authority to the Court.  Trial tr. at 459.  The admission of Vaughn's testimony as to his

understanding was a key component of the government's case, in light of the unclear nature of his

interchanges with Simels, the interpretation of which the government's own case agent

acknowledged left "wiggle room."  Trial tr. at 995.  Further, the Court refused to provide an

instruction that it was the province of the jury – not Vaughn – to infer Simels' intent.

I.     INEFFECTIVE ASSISTANCE OF COUNSEL WITH RESPECT TO THE TAPED
       RECORDINGS RELIED ON BY THE GOVERNMENT AS A CENTRAL
       COMPONENT OF ITS CASE.
       Defense counsel failed: to seek 81 additional recordings on a timely and complete basis; to

review the recordings upon their belated disclosure just 6 weeks before trial; to timely renew his

request to permit the defendant to review them; and to request a continuance to obtain a translation

of them.  The 81 recordings of conversations of principal government witness Selwyn Vaughn,

which were belatedly and/or incompletely disclosed, and reports and notes related to Vaughn's

25

activities during the charged conspiracy. Even after the disclosure, the voluminous nature of the recordings, in a foreign language and vernacular, without notes or index, within weeks of trial, effectively hid their significance. The government thereby gained an unfair tactical advantage as a result of the late disclosure, combined with the lack of review by Shargel and preclusion of review by Simels, and the lack of calculation of the recordings' value. This deprivation affected the defense's ability to challenge Vaughn and the government's theory of case, which rested on interpretation of the taped recordings. The prejudice stemming from the belated disclosure, occurring just six weeks prior to trial, was compounded by the Court's issuance of a protective order that precluded Simels from personally listening to the recordings. As a result, Simels was unable to assist in his own defense preparation, including the ability to counter prosecution attributions arising from the recordings that were contrary to Simels' knowledge, such as the imputation of corruption relating to a purported Khan escape plan in 2007 that the government tried to link to Simels but as to which he had no knowledge and which the recordings failed to substantiate. Simels' preclusion of such review was worsened by the ineffectiveness of defense counsel in failing even to review the recordings himself.

The tapes contained potentially pivotal significance, to the extent the recordings indicated that Simels was not involved in and not aware of any escape plan on behalf of Khan. Defense counsel also failed to pursue obtaining DEA 6 Reports or notes of the prosecution's review of the 81 recordings as *Jencks* material. The defense could have used these recordings, which include Vaughn discussing drugs, to cross examine Vaughn as to his claim he was never a drug trafficker. Further, Shargel was ineffective in failing to counter the government's questioning of Vaughn as to a call between him and Glen Hanoman in March 2007 to impute to Simels awareness of a purported escape plan by Khan, prompting his transfer to another facility, and reliance on such unproved

26

speculation, where, had Shargel reviewed the tapes and enabled Simels to assist in preparing his defense by listening to them, the defense could have shown that the March conversation did *not* pertain to such a plan. Trial tr. at 302-03. Shargel, although told at a status conference on July 10, 2009 that Simels could hear the conversation, never advised Simels of this; Simels was not at the status conference, and Shargel precluded Simels from listening to the tapes.

The fact of the March 2007 call – as to which the defense was provided only a DEA 6, not a recording – was introduced at trial to implicate Simels in corruption. Yet, Shargel failed to press government for *Jencks* material on the subject of Vaughn's testimony, and failed to challenge the Court's protective order precluding Simels from personally listening to the tapes as a due process violation, instead saying it was "reasonable" to permit a review of the recordings first and then come back to the Court, where Shargel never actually did so. Shargel accepted the judge's redactions of the March 27, 2007 call to Simels without objection. Shargel did not listen to the 81 recordings after receiving them. Shargel should have, after finally receiving the 81 recordings, gone back to the judge to request that he revisit the redaction of the DEA 6 for context as to the remaining recordings.

Nor were the recordings reviewed to determine the nature of their impact on the entirety of the government investigation of Simels and the so-called "attorney wall" between the prosecution team handling the Khan case and the prosecution team handling the case against Simels or to consider their interrelationship with the four Guyana recordings introduced at trial. Only with Simels' review and analysis – or an adequate substitute not employed by defense counsel – could the full value of the recording have been brought to light.

27

**GROUND THREE – FUNDAMENTAL CONSTITUTIONAL ERROR ARISING FROM OUTRAGEOUS GOVERNMENT CONDUCT, CONTRARY TO THE FIFTH AMENDMENT DUE PROCESS CLAUSE, IN INITIATING THE INVESTIGATION OF SIMELS IN RELIANCE ON A KILLER, AND FROM THE GOVERNMENT'S UNWARRANTED INTERFERENCE IN THE ATTORNEY-CLIENT RELATIONSHIP, CONTRARY TO THE SIXTH AMENDMENT, IN DIRECTING THE SECRET RECORDING OF CONVERSATIONS WITH SIMELS BY A CONFIDENTIAL INFORMANT FEIGNING PARTICIPATION IN THE DEFENSE TEAM.**

The government used an individual implicated in murder, Selwyn Vaughn, who was seeking to avoid prosecution for his involvement in serial murders, to seek to ensnare an established criminal defense attorney in the midst of preparing for trial. Vaughn was paid at least $50,000.00 by the government, and he, his wife and 3 children were given visas to remain in the United States, in exchange for his work as a confidential informant. The government was aware of Vaughn's violent activities. Vaughn had contacted the government shortly after Khan's arrest, offering to work as an informant and advising that he had assisted Khan in finding enemies of Khan who were killed. Simels, a zealous advocate with no prior criminal history, was targeted without a reasonable basis and pursued by means of a murderous thug unleashed by the government. The wholly ambiguous nature of the government's evidence, susceptible to divergent interpretations, highlights the essential unfairness of the government's efforts, where no bribe was ever explicitly offered or accepted, nor was any other obstructive activity clearly attributable to Simels. Instead, the government's case was prompted by a visit by Simels to David Clarke, a potential government witness against his client, Khan, despite the fact that there was no legal or ethical prohibition on defense counsel's engaging

28

in such trial preparation.  The government presented false testimony to the effect that a prison employee had authority to bar attorney visits made for the purpose of interviewing a witness, when Bureau of Prisons program statement 1315.07 provides that "The Warden shall, under the conditions of this section, permit visits by the retained, appointed, or prospective attorney of an inmate or by an attorney who wishes to interview an inmate as a witness."  Under the government's theory, if a prison contractor employee asked an attorney if he was retained, and the attorney lied and said he was prospective, a prosecution would follow.  The misstatement is simply immaterial; all the more reason to believe it was a fantasy by the contract employee as was her claim that attorneys could not interview witnesses.  By relying on a false claim of impropriety in visiting an inmate witness, the government set up a improper premise for intrusion into a defense camp.  By using a violent individual such as Vaughn, who initiated all verbal references to  pressure on potential witnesses in the unique context of criminal defense trial preparation, the government exceeded the bounds of fairness under the Due Process Clause.  As detailed by case agent John Mazzella, who testified as to the nature of the investigation, the government created the alleged crime through initiating and pursuing all improper suggestions.  *See, e.g.*, Trial tr. at 934 (Agent Mazzella told Vaughn to propose that "one of the witnesses that Mr. Simels wanted Vaughn to get to had agreed to falsely testify in return for money."): 1024 (Mazzella testifying regarding the government's plan: "There was a bunch of options being discussed at that time, and one of them being violence, and we can't go down the violence route. So, we wanted to get a person, you know, go down the route of having someone that was prepared to falsely testify in return for money, because that was one of the options out there.").

29