UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROBERT SIMELS,           )
                               )     13 CV 1224 (JG)
     Petitioner,         )
                               )     08 CR 640 (JG)
     v.                       )
                               )
United States of America     )
                               )
     Respondent.       )

## PRE-ARGUMENT MEMORANDUM
## REGARDING STATUS

Currently pending before the court are Robert Simels' Motion for New Trial filed pursuant to Fed.R.Crim.P Rule 33 and his Motion to Vacate Conviction filed pursuant to 28 U.S.C. § 2255. Both petitions raise numerous issues, many overlapping. The briefs filed by both parties have fully set forth the controlling authority that governs the court's consideration of the issues, as well as the requirement that this matter be set down for an evidentiary hearing.

Over the course of the last six months, the government and the defense endeavored to perfect the record on one set of issues that predominates in both petitions: the issues relating to the "81 recordings" that were made by Selwyn Vaughn in 2007 and 2008 and which were disclosed to the trial defense team shortly before trial. The tardy disclosure of these recordings, which the defense contends were required to be disclosed pursuant to *Brady*, Rule 16, and the Jencks

Act, has now spawned issues challenging the conviction based on the government's failure to reveal these recordings earlier and in a manner that would have allowed the defense to use the recordings at trial, and that challenge the trial defense team's failure to use the recordings to impeach Vaughn, and to dispel the government's overriding theory at trial.  Thus, the late disclosure of the recordings raises both Due Process and Sixth Amendment Effective Assistance of Counsel Constitutional issues.

In general terms – and to some extent in specific terms – the prior briefs filed by Simels have spelled out these issues:  The recordings that had been revealed as of the date that the Reply Brief was filed in March, 2014 (Doc. 266), demonstrated certain things beyond dispute:  Simels was not a member or mastermind of a criminal conspiracy to obstruct justice known as the Phantom Squad.  The recordings also show that Vaughn was comfortable discussing drug deals with his erstwhile confederates in Guyana, a comfort that was obviously reciprocated, thus belying his claim at trial that he was not involved in drug dealing (Trial Tr. 556).

That much was obvious from the initial disclosures by the government. More recent disclosures of additional recordings not only confirm these earlier revelations, they also raise additional issues and additional grounds to impeach Vaughn's trial testimony and the government's theory at trial.

Before addressing the substance of these latest recordings, the defense will review the procedural history of the disclosure of the recordings – with some annotations – dating back to the pretrial stage:[1]

During an April 2009 motions calendar, the government explained to the court that the investigation of Simels began when a confidential informant told an agent that people with whom he was in contact in Guyana had asked him to contact Simels and that the informant assumed that this contact was for the purpose of engaging in acts of obstruction of justice.  (This theory reflected what was also contained in the Title III wiretap application that had been submitted to Judge Swain in the SDNY).

This theory, upon which this court relied in denying the Motion to Dismiss, failed to reveal that the Confidential Informant did not suddenly appear at the doorstep of the agents in May 2008, but had actually been an active informant for the government for over a year – since December of 2006 – and that he had been recording his phone calls with the people in Guyana *and* that the recordings were in the possession of the government *and* there was not the slightest hint that anybody in Guyana had asked the informant to contact Simels in order to further some obstruction of justice scheme.  In fact, on the contrary, the only recordings

---

[1] This chronology reiterates what was presented in the Reply Brief (Doc. 266, page 4 – 6).

that even remotely touch on this topic – later admitted as GX- 400 at trial – reveal that Vaughn raised the topic of contacting Simels. The people with whom he was talking had no idea what he was talking about and made not the slightest suggestion – even by implication – that such contact would be for an illicit purpose.

After discussing the Sixth Amendment aspects of the government's decision to send an informant into the defense camp, the topic of the April 2009 pretrial conference turned to the government's failure to reveal the existence of one particular recording earlier. This was the recording made in March 2007 – more than a year earlier – which reflected Vaughn's first attempt to contact Simels. The government at one point had a tape of this recording, as reflected in a DEA-6 that was furnished to the trial team in redacted fashion prior to that hearing and which has now been furnished to the defense in unredacted form. The government revealed that it had lost this recording. This court expressed skepticism about the failure to reveal this recording earlier (Hearing Transcript page 28). The government's response was, "We didn't learn about it until – that there was a recording of a conversation until a few weeks ago. I contacted the DEA. I asked them for a copy of the recording. They are looking for the recording." (*Id*). Actually, the DEA was fully aware two weeks earlier, on April 3, 2009, that the recording no longer existed (this revelation was disclosed in a DEA-6 that was not

4

disclosed to the defense until April 2014).  What is more perplexing (to say it

mildly), is how the government "just learned about this recently" when, in fact, the

agent who obtained the recording and logged it in as evidence on March 29, 2007

was the case agent in *this* case (DEA-6 dated April 2, 2007 documenting

acquisition of N-9).  Thus, apparently the "we" referred to in the AUSA's

comments to this court referred simply to the lawyers' lack of prior knowledge, not

the prosecution team.  This court's skepticism continued, "I don't get it.  How

could they not have, when you were doing a Rule 16, the same case file, the same

agents, the same informant, a recorded call of Mr. Simels?  I don't really get how

this fell through the cracks."  (Motion Hearing Transcript page 29).

  As things developed over the next several weeks, it turned out that the

"cracks" were actually gaping holes through which discovery was apparently

falling.  In May, shortly after the hearing in April, the government revealed that it

had discovered seven more tapes.  These later became what were introduced at trial

as GX-400 (Trial Transcript 308 *et seq*.).  These tapes revealed that the

conversations that Vaughn was having with people in Guyana had nothing to do

with enlisting Simels' support in obstruction of justice endeavors.  These tapes

were introduced at trial under the theory that what was said by the Guyanese

declarants was admissible under Rule 801(d)(2)(E).  This court demanded that the

government "link up" this evidence and prove that any such conspiracy existed.

The court conditionally admitted the tapes, noting that proof of the existence of the conspiracy would be required prior to the end of trial (Trial Tr. 306, 324).  No such evidence was ever introduced at trial and, regrettably, the evidence was never stricken – trial counsel never raised the issue with the court after the evidence was conditionally (and, in our view, improperly, admitted).

The timing of the calls contained in GX-400 was important to the government's case. The government's theory was concise and easy to understand: Simels went to visit Clarke, an inmate in a local jail who was expected to be a government witness, in March, 2008.  His efforts to talk to Clarke were not successful.  Therefore, according to the government's theory, Vaughn was contacted by the Phantom Squad in Guyana – in April 2008 (Trial Tr. 309, 342, 343) – and implored to contact Simels to determine what to do next.  Thus, it could easily be inferred that Simels was running the U.S. branch of the Phantom Squad. As this court remarked at the April 17, 2009 hearing, given this chronology, it would have been negligent for the government not to pursue its investigation of Simels.

The timing was emphasized in the government's argument to this court that the evidence contained in GX-400 should be admitted (Trial Tr. 337 et seq); it was important in the government's earlier presentation to Judge Swain when the government applied for a wiretap (¶ 19; Doc. 82-3, page 14 of wiretap application),

and it was important when the government provided an overview of the case to the Second Circuit and the appellate court later adopted that incorrect sequence of events in its decision. 654 F.3d 161 at 164 (stating that in March 2008, agents learned that Simels attempted to speak with Clarke and, "In April 2008, Vaughn learned in phone calls with members of Khan's gang in Guyana that Khan wanted Vaughn to speak with Simels").

It is a picture which, on its face, does lead to the logical conclusion that Simels' unsuccessful effort to reach Clarke prompted the calls to Rodrigues, Hanoman, Banks and the others in Guyana and the need to get Vaughn involved in the efforts to obstruct justice in connection with Clarke.

But the recent disclosure of the recordings and the index of when these calls occurred reveal that the government's theory was based on undeniably false premise. The tapes reveal with absolute certainty that the calls between Vaughn and the people in Guyana reflected in GX-400 actually occurred *before* Simels went to visit Clarke. The recordings occurred not as a result of Simels' unsuccessful effort to interview Clarke, because those calls occurred several weeks prior to the time that Simels went to visit Clarke.

What was not known prior to the disclosure of the tapes to the defense was that the tapes themselves reveal that the "date modified" proves definitively that the calls were made in March, *prior* to the time that Simels went to see Clarke.

7

The information on the tapes reveals that Vaughn's testimony at trial – that these tapes were made in April – was false and the government had to know it was false.

At no time prior to trial – or since – has the government produced any DEA-6 that documents the date or the circumstances surrounding the recordings reflected on GX-400.  There is no "trailer" in which Vaughn dictates the time or date of the GX-400 calls.   To this date, the government has not been able to produce the actual disks that were furnished to the defense in April 2009 (which contained GX-400), or June 15, 2009 (the 81 recordings) so that it could be determined whether what the government produced to the defense counsel revealed the false premise upon which the government was proceeding.  The disk that was furnished to undersigned counsel in June 2014, however, unmistakably shows that the recordings could not have been made in April, as Vaughn testified, but, instead, were made in mid-March.

Returning to the chronology:  In June 2009, the government revealed that there were 81 more tapes.  These recordings, according to the government, were not related to the issues at trial, but would be disclosed to the defense nevertheless.  However, because of some vague notion that disclosing the recordings might present a danger, it was decided that a protective order would be implemented that prohibited Simels himself from listening to the recordings, or even being informed of a summary of the contents.  Only the lawyers could listen to the recordings.  The

recordings, it turns out, reflected conversations that Vaughn had with numerous people, including alleged co-conspirators of Simels (and in a limited number of instances, discussing Simels).  Many of the recordings reflect Vaughn involved in drug transactions.   Virtually all (with limited exceptions) of the recordings are in Patois, which is a language that is almost impossible for an English-speaker to understand easily.

As argued in our earlier briefs, this court was induced to enter the protective order based on the trial prosecutors' assurance that they had listened to the tapes (the AUSA declared at the July 9, 2009 status conference that he had listened to half the recordings and his trial partner had listened to the other half) and there was, according to the AUSA, nothing relevant to the Simels case.  To this day, the defense has found little evidence to support the government's assurance that the prosecutors had listened to the tapes:  (1) the tapes are not in English, and the prosecutors made no mention of employing a translator; (2) the defense has asked for copies of the prosecutors' notes that were written contemporaneously, but none exist; (3) there really are not 81 separate tapes, because several of the recordings are simply "trailers" that announce what the next tape includes.  It is odd that the prosecutor assured the court that had had listened to half and his colleague had listened to half, without mentioning that there really were not 81 recordings.

As noted above and in the earlier briefs submitted to the court, these tapes portray Vaughn in a completely new light.  He *never*, not one time – despite the fact that he was acting under the authority of the case agent in *this* case – elicited a single word from any of the alleged co-conspirators that linked Simels to any criminal conduct, any attempt to obstruct justice, or any other conduct that even approaches the line of unethical behavior.  Without unnecessarily repeating the arguments in the earlier briefs, it bears emphasizing that the government indicted Simels for conspiring with all these people – and later argued to the jury that he was the leader of this corrupt organization – and yet, not a single taped conversation between Vaughn and these alleged co-conspirators supports this argument even by nuanced innuendo.  This is true, despite the fact that Vaughn was working under the control of a case agent who *must* have been discussing with Vaughn the nature of the calls being made and the extent to which it would be helpful if Vaughn might steer the conversation to the topic of Simels' role in this sinister conspiracy. Yet, there is nothing. (During trial, it was made clear that the government agents did encourage Vaughn to bring up certain topics with Simels during their recorded conversations; *see, e.g.,* Trial Tr. page 371 – 372; 490; 625).

These recordings also reveal that Vaughn was involved in drug dealing (in an undercover capacity) in a manner that belied his contention at trial, that he had no involvement in drugs, ever.  The willingness of the unwitting participants to

deal with him could surely have been presented by trial counsel – if the tapes had ever been reviewed – to argue that Vaughn was actually an old-hand at drug dealing who could only have gained the trust of the other participants if he had experience with them in the drug trade.  Had the jury believed that Vaughn had, in fact, been a drug dealer in the past (as these recordings would reasonably lead one to believe), that would mean that he had lied to the government agents in his prior statements and to the jury in his prior testimony.

The recordings also reveal that Vaughn was participating in "sting" operations that resulted in the seizure of drugs.  At trial, Vaughn testified that he had been threatened and attributed this to his dealings with Simels.  Any experienced trial counsel, had he been aware of the recordings, could have used the evidence on the 81 recordings to demonstrate that there were many people who had a motive to threaten Vaughn once his undercover work was exposed to the public. At a minimum, the defense could have filed a motion in limine to exclude any "threat evidence" as being too speculative and prejudicial given the vague genesis of the threat.

The revelation of the N-10 tapes is equally revealing.  These tapes, made in March 21, 2007, were made before the time that Vaughn contacted Simels in 2007. The N-10 recordings were disclosed to the defense prior to trial, but were never played at trial.

At trial, (Trial Tr. 302 – 303) the government revealed that Vaughn was sent to talk to Simels to inquire about a supposed escape attempt by Khan (or at least Vaughn was sent to talk to Khan, and Vaughn decided that the method of getting to Khan was through Simels).  The government claimed that Vaughn had a conversation with Simels and it was prompted by the supposed escape.  Vaughn talked to Simels.  According to the April 2007 DEA report, regarding the March 2007 call, Simels invited Vaughn to come in.  But Vaughn did not visit Simels, so obviously someone in DOJ decided not to send Vaughn in.  See A-129.

N-10, which was disclosed to the defense prior to trial reflects several calls that were made by Vaughn with alleged co-conspirators in 2007.  On these tapes, Vaughn is asked to contact Simels to see if there is any assistance that Vaughn can provide in the defense of Khan.  There is no suggestion whatsoever during any of these recordings that Simels has participated in (or expressed any interest in participating in) any obstructive conduct.  Nor do the alleged co-conspirators even hint that they want Vaughn to contact Simels for the purpose of doing anything wrong.

The point is that trial defense counsel failed to ever use these tapes to show that Simels was *not* part of any conspiracy.  N-10, disclosed to the defense shortly before trial, without a transcript, clearly contradicts the government theory that Simels is in league with the Phantom Squad in a conspiracy to obstruct justice.

12

Finally, a brief recitation of the recent history regarding the tapes is in order. In June 2013, undersigned counsel requested that the government provide a set of the "81" tapes to the defense. The government counsel agreed, subject to the continuing protective order. When the disk of recordings arrived, however, there were not 81 recordings. In fact, there were fewer than 45 recordings and it was not clear that these recordings were the same as the 81 recordings that are the subject of the § 2255 petition.

When undersigned counsel complained that the disk provided did not contain 81 recordings, the AUSA assured counsel that he would continue to look for the recordings. Eventually, however, the AUSA announced that there were not 81 recordings. In fact, there never were 81 recordings. According to the AUSA then working on the case, the notion that there ever were 81 recordings was simply a typographical error in correspondence to the court back in 2009. The fact that trial counsel had told the court that there were 81 recordings and that trial counsel had personally listened to them was simply an error. Undersigned counsel, skeptical that this could possibly be true, requested that the government furnish to the defense *all* DEA-6's that reflected any recordings by Vaughn. Shortly before the scheduled April 2014 hearing, the AUSA furnished approximately 85 pages of unredacted DEA-6's. These reports also did not reflect that there were 81 recordings. Rather, these reports indicated that there were approximately 45

13

recordings – but they were not the same recordings that were furnished in June 2013 to undersigned counsel.  A set of partially overlapping circles of tapes – a Venn Diagram – was needed to ascertain what existed and what had been produced.

And there matters stood, until that AUSA retired to run for public office and the current AUSA, Ms. Dean, took charge.

Government's counsel fairly quickly discovered the 81 recordings.  A disk containing all the recordings has been furnished to the defense.  In addition, the current AUSA readily agreed to modify the protective order (which served absolutely no purpose in recent years), so that Mr. Simels could review the evidence for the first time in five years.

But problems remain.  First, despite new efforts to locate the DEA-6's that relate to the current crop of 81 calls, the government contends that many of the recordings have no corresponding DEA-6.  This is apparently due to the fact that that there were two different handlers for Mr. Vaughn.  The local New York agent (Ms. Jackson) would prepare reports when Vaughn conducted undercover work for her or another NY agent.  But when Vaughn was working for an agent in Port of Spain, if he made a recording, he would hand the recording over to Agent, who would make no report whatsoever, but would simply mail the recording to the agent in Port of Spain who also would make no report of the tape.  (It should be

14

noted that the agent in Port of Spain did prepare many reports of his activity in this case, but apparently he failed to prepare reports when he received tapes of undercover work performed by Vaughn).  There is no chain of custody or any other report with respect to dozens of these recordings.

This leads to the obvious question:  Do we have all the recordings?  If there are no reports and no effort to contact Vaughn to find out to whom he was giving these recordings and who was logging the tapes into evidence, how can there be any comfort that the government has finally discharged its constitutional duty to furnish this evidence to the defense?

An evidentiary hearing is essential to resolve the issues presented by both the Rule 33 and the § 2255 petition.  First, as noted in the Reply brief, the Second Circuit, as well as this District, have expressed a clear preference to conduct evidentiary hearings in connection with § 2255 proceedings to facilitate the issuance of reliable findings of fact and to enable an appellate court, if necessary, to fully review both the factual findings of the lower court, as well as any resulting conclusions of law.  *Bennett v. U.S.*, 663 F.3d 71, 76 (2d Cir. 2011); *Sparman v. Edward*, 154 F.3d 5 (2d Cir. 1998); *Ramchair v. Conway*, 335 Fed. Appx. 122, 124 (2d Cir. 2009).  *See also Smith v. U.S.*, 348 F.3d 545, 551 (6th Cir. 2003).

In this case, there is no evidence in the record concerning the extent to which trial counsel reviewed, considered or had any familiarity with the various

recordings that were furnished by the government in 2009 (other than the actual recordings between Vaughn and Simels). Because a review of the recordings has generated a claim that trial counsel was ineffective in failing to exploit the information learned from the recordings, some testimony from trial counsel is necessary to determine whether trial counsel employed any strategy in connection with these recordings, or if the failure to listen to and use the recordings during trial reflected simple negligence. *See Hinton v. Alabama*, 134 S. Ct. 1081 (2014) (strategy may not excuse failure to develop a defense if the failure reflects an ignorance of the facts or the law). Evidence relating to the failure to reveal the date that the GX-400 recordings were made, and whether trial counsel ever reviewed the N-10 recordings is also necessary to develop an adequate record – and ultimately to prove that Simels was denied a fair trial with effective representation.

The other issues raised in connection with the ineffective assistance of counsel claim (the failure to present the testimony of numerous witnesses and evidence relating to Simels' hearing deficits), also requires testimony from the trial attorneys.

Testimony from the case agent and the agent in Port of Spain who handled Vaughn and the recordings is also essential to determine when the government became aware of these recordings and, equally troubling, whether there might still

16

be more recordings, or DEA-6 reports, that should have been furnished to the

defense.

RESPECTFULLY SUBMITTED,

GARLAND, SAMUEL & LOEB, P.C.

/s/ *Donald F. Samuel*

DONALD F. SAMUEL

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225
dfs@gsllaw.com

RICHARD C. KLUGH, P.A.

/s/ *Richard C. Klugh*

RICHARD C. KLUGH

Courthouse Center
Penthouse One
40 Northwest Third Street
Miami, Florida 33128

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT SIMELS, | ) | |
| | ) | 13 CV 1224 (JG) |
| Petitioner, | ) | |
| | ) | 08 CR 640 (JG) |
| v. | ) | |
| | ) | |
| United States of America | ) | |
| | ) | |
| Respondent. | ) | |

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this date served the within and foregoing

PETITIONER ROBERT SIMELS' PRE-ARUMENT MEMORANDUM

REGARDING STATUS with the Clerk of Court using the CM/ECF system which

will automatically send email notification of such filing to the attorneys of record.

This the 24th day of June, 2014.

/s/ *Donald F. Samuel*
DONALD F. SAMUEL